## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

**JERRY J. LUNDY,**

   **Plaintiff,**        **Case No. 17-CV-1467**

 **v.**

**DR AG SERVICES, INC.,**

   **Defendant**.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Jerry J. Lundy ("Plaintiff") has filed the above action against DR Ag Services, Inc. ("DR") alleging that DR failed to accommodate his disability and terminated his employment because of this disability in violation of the Americans with Disabilities Act ("ADA"). DR brings this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and Civil L. R. 56 because: (1) Plaintiff voluntarily resigned from his position and therefore cannot state a *prima facie* case for discrimination; (2) Plaintiff was temporarily removed from the work schedule for a legitimate, non-discriminatory reason because he did not have the required Commercial Driver's License ("CDL") necessary for driving his work truck and was told he would be back on the schedule as soon as he received his CDL; (3) DR agreed to provide the requested reasonable accommodation (allowing Plaintiff to be accompanied by a service dog), once Plaintiff provided medical certification of the need for the accommodation; and (4) Plaintiff was not qualified for the position without a CDL, which he refused to get, and, therefore,

Plaintiff cannot state a *prima facie* case for discrimination. Accordingly, DR asks that the Court dismiss this complaint in its entirety with prejudice.

## STATEMENT OF FACTS

Plaintiff was hired as a driver by DR, driving commercial vehicles to various farm clients for the purpose of pumping fertilizer into the ground. *Def's Proposed Findings of Fact ("DPF") ¶ 1; Transcript of Deposition of Jerry Lundy ("Ex. A"), attached as Ex. A to Affidavit of Geoffrey S. Trotier ("Trotier Aff."), pp. 38, 41 & 188-89.* When driver services were not needed and mechanic work was available, Plaintiff also worked as a diesel mechanic for DR. *DPF ¶ 2; Dkt. 1, ¶ 16.*

When initially hired by DR, neither Plaintiff, nor any other DR employee, was required to hold a CDL to perform his job duties. *DPF ¶ 3; Ex. A, p. 116.* Subsequently, the Wisconsin statute governing CDLs changed, removing the exemption that allowed Plaintiff to drive DR trucks on public roadways without a CDL. *See* Wis. Stat. § 340.01(24)(b)2. As a result, Plaintiff, and all DR drivers and mechanics, were required to hold a valid CDL. *DPF ¶ 4; Pl.'s Resps. to Def.'s First Set of Requests to Admit, attached as Ex. B, to Trotier Aff. ("Ex. B, RTA") No. 4.* Plaintiff knew that he could not be returned to the schedule until he obtained his CDL. *DPF ¶ 5; Ex. A, pp. 116, 123, 171, 180 & 199.* However, Plaintiff refused to get his CDL, complaining, "I'm a mechanic, not a CDL driver." *DPF ¶ 6; Ex. A p. 179 & 180.* Instead of pursuing his CDL and returning to driver work, Plaintiff decided he wanted to work solely as a diesel mechanic and quit his job at DR to start his own diesel mechanic business, which he had established several months earlier. *DPF ¶ 7-8; Ex. A, p. 18.*

Prior to his resignation, Plaintiff requested a reasonable accommodation for his disability, post-traumatic stress disorder ("PTSD") – to be accompanied by a service dog when necessary.

2

*DPF ¶ 9; Ex. A, p. 146; Plaintiff's Work Log, attached as Ex. C to Trotier Aff. ("Ex. C."), p. 1.* DR promptly agreed to provide this reasonable accommodation, responding to Plaintiff's question as to whether it "would be an issue if [he] brought a my [sic] service dog to work with [him]", with an immediate "No, not at all." *DPF ¶ 10-11; Ex. C., p. 1.* Like any employer, DR asked Plaintiff to provide medical certification of the need for the reasonable accommodation. *DPF ¶ 12; Ex. C, p. 4*

## I.    DR'S BUSINESS.

DR is an agriculture-based business which collects cow manure from farmland and then injects the fertilizer back into the farm fields. *DPF ¶ 13; Affidavit of Jennifer Risch ("Risch Aff.") ¶ 2.* DR employs several drivers who operate 6x6 trucks weighing in excess of 10,000 pounds to carry out this process. *DPF ¶ 14; Risch Aff. ¶ 3.* The drivers drive the 6x6 trucks from DR's shop in Plymouth, Wisconsin on public roadways to the client farms, which can be up to two hours away from the DR shop. *DPF ¶ 15-16; Risch Aff. ¶ 4.* Once at the farms, the drivers pick up the manure from designated farm areas and inject the manure into the farm fields. *DPF ¶ 17; Risch Aff. ¶ 4.* When this process is complete at one farm, the drivers take the 6x6 trucks either back to the DR shop or to the next client farm, again using public roadways. *DPF ¶ 18; Risch Aff. ¶ 4.*

When driving DR's 6x6 trucks, the driver must have a CDL because the 6x6 trucks are considered "commercial vehicles". *See* Wis. Stat. § 340.01(8)(a). Prior to April 2014, the 6x6 trucks used by DR were exempted from CDL requirements because they were an "implement of husbandry", as defined in Wis. Stat. § 340.01(24). *See* Wis. Stat. § 343.05(4)(a)2. In 2014, the definition of "implement of husbandry" was revised to exclude commercial motor vehicles exceeding 10,000 pounds, pursuant to 49 C.F.R. § 390.5, so DR's 6x6 trucks were no longer exempt from CDL requirements. *See* Wis. Stat. § 340.01(24)(b)2. DR learned of this change in

3

the law once one of its drivers received a ticket for failing to have a CDL in April 2015. *DPF ¶ 19; Risch Aff. ¶ 5.* DR immediately took all non-CDL-holding drivers off the schedule and instructed them to get their CDLs. *DPF ¶ 20; Ex. B, RTA No. 4.* Once the drivers received their CDL, they would be placed back on the schedule. *DPF ¶ 21; Tr., p. 199.*

From time to time, DR trucks need regular repair or recertification. *DPF ¶ 22; Risch Aff. ¶ 6.* DR employs one full-time mechanic who would repair DR's trucks and certify that they met Department of Transportation requirements. *DPF ¶ 23; Risch Aff. ¶ 7.* That mechanic also is required to hold a CDL so he can test any repaired trucks on the highway before putting them back in general use. *DPF ¶ 24; Risch Aff. ¶ 7.* DR also employed drivers with mechanic skills, including Plaintiff, who would assist with repairs when workload dictated. *DPF ¶ 25; Risch Aff. ¶ 8.* When a vehicle would break down on site, these drivers would take a break from their driving duties and make the necessary repairs. *DPF ¶ 26; Risch Aff. ¶ 8.*

## II.    PLAINTIFF WORKED FOR DR AS A DRIVER.

Plaintiff initially was hired by DR in late 2013 as a part-time driver. *DPF ¶ 27; Ex. A at pp. 38 & 188.* After a brief absence, Plaintiff returned to work on a full-time basis. *DPF ¶ 28; Ex. A, p. 39.*

In his Complaint, Plaintiff claims that when he was brought back, it was as a full-time mechanic. *DPF ¶ 28; Dkt. 1, ¶ 14.* Plaintiff never received an offer letter or any document indicating that he was hired as a mechanic. *DPF ¶ 30; Ex. A, p. 39.* Plaintiff acknowledges that he worked more as a driver than as a mechanic for DR. *DPF ¶ 31; Ex. A, p. 53.* Further, Plaintiff's time cards and work logs indicate that he worked the majority of the time as a driver, even though it may have been his preference to work as a mechanic. *DPF ¶ 32; Ex. A, pp. 50-111.* Plaintiff never complained that he was assigned to more driver duties than mechanic duties. *DPF ¶ 33; Risch Aff. ¶ 9.*

4

Plaintiff clearly remembers working as a mechanic whenever his time cards indicated that he was at DR's shop. *DPF ¶ 34; Ex. A pp. 60-61.* Based on these clear recollections, Plaintiff worked as a mechanic for DR approximately 34% of the time he was a full-time employee. *DPF ¶ 35; (See also* Ex. A for testimony of shop work as follows: 1/31/2014: Tr. pp. 46, 61 & Plaintiff's 2014 Time Cards, attached as Ex. D to Trotier Aff. ("Ex. D"), p. 1; 4/4/2014: Tr. pp. 47, 61 & Ex. D, p. 2; 4/5/2014: Tr. pp. 47, 61 & Ex. D, p. 2; 4/6/2014: Tr. pp. 47, 61 & Ex. D, p. 2; 4/14/2014: Tr. pp. 47, 61 & Ex. D, p. 3; 4/15/2014: Tr. pp. 47, 61 & Ex. D, p. 3; 4/16/2014: Tr. pp. 47, 61 & Ex. D, p. 3; 4/20/2014: Tr. pp. 50, 61 & Ex. D, p. 4; 4/28/2014: Tr. p. 51 & Ex. D, p. 5; 4/29/2014: Tr. p. 52 & Ex. D, p. 5; 4/30/2014: Tr. p. 52 & Ex. D, p. 5; 5/8/2014: Tr. p. 61 & Ex. D, p. 6; 5/12/2014: Tr. p. 57 & Ex. D, p. 7; 5/13/2014: Tr. p. 57 & Ex. D, p.7; 5/14/2014: Tr. p. 57 & Ex. D, p.7; 5/20/2014: Tr. p. 61 & Ex. D, p. 8; 5/27/2014: Tr. p. 61 & Ex. D, p. 9; 5/28/2014: Tr. p. 61 & Ex. D, p. 9; 5/29/2014: Tr. p. 61 & Ex. D, p. 9; 6/2/2014: Tr. p. 61 & Ex. D, p. 10; 6/3/2014: Tr. p. 61 & Ex. D, p. 10; 6/9/2014: Tr. p. 60 & Ex. D, p. 11; 6/10/2014: Tr. p. 60 & Ex. D, p. 11; 6/11/2014: Tr. p. 60 & Ex. D, p. 11; 6/12/2014: Tr. p. 60 & Ex. D, p. 11; 6/13/2014: Tr. pp. 61-62 & Ex. D, p. 12; 6/16/2014: Tr. pp. 61-62 & Ex. D. p. 12; 6/17/2014: Tr. pp. 61-62 & Ex. D, p. 12; 6/18/2014: Tr. pp. 61-62 & Ex. D, p. 12; 6/19/2014: Tr. pp. 61-62 & Ex. D, p. 12; 6/20/2014: Tr. p. 62 & Ex. D, p. 13; 6/23/2014: Tr. p. 62 & Ex. D, p. 13; 6/24/2014: Tr. p. 62 & Ex. D, p. 13; 6/25/2014: Tr. p. 62 & Ex. D, p. 13; 6/26/2014: Tr. p. 62 & Ex. D, p. 13; 6/27/2014: Tr. p. 62 & Ex. D, p. 14; 6/28/2014: Tr. p. 62 & Ex. D, p. 14; 6/30/2014: Tr. p. 62 & Ex. D. p. 14; 7/1/2014: Tr. p. 62 & Ex. D, p. 14; 7/2/2014: Tr. p. 62 & Ex. D, p. 14; 7/3/2014: Tr. p. 62 & Ex. D, p. 14; 7/28/2014: Tr. p. 61 & Ex. D, p. 16; 7/29/2014: Tr. p. 61 & Ex. D, p. 16; 7/30/2014: Tr. p. 61 & Ex. D, p. 16; 8/1/2014: Tr. p. 61 & Ex. D, p. 17; 8/4/2014: Tr. p. 61 & Ex. D, p. 17; 8/5/2014: Tr. p. 61 & Ex. D, p. 17; 8/6/2014: Tr. p. 61 & Ex.

D, p. 17; 8/12/2014: Tr. p. 61 & Ex. D, p. 18; 8/13/2014: Tr. p. 61 & Ex. D, p. 18; 8/14/2014: Tr.

p. 61 & Ex. D, p. 18; 8/19/2014: Tr. p. 61 & Ex. D, p. 19; 8/20/2014: Tr. p. 61 & Ex. D, p. 19;

8/21/2014: Tr. p. 61 & Ex. D, p. 19; 8/22/2014: Tr. p. 61 & Ex. D, p. 20; 8/25/2014: Tr. p. 61 &

Ex. D, p. 20; 8/26/2014: Tr. p. 61 & Ex. D, p. 20; 8/27/2014: Tr. p. 61 & Ex. D, p. 20; 9/2/2014:

Tr. p. 61 & Ex. D, p. 21; 9/13/2014: Tr. p. 61 & Ex. D, p. 23; 9/15/2014: Tr. p. 61 & Ex. D, p.

23; 9/16/2014: Tr. p. 61 & Ex. D, p. 23; 9/18/2014: Tr. p. 61 & Ex. D, p. 23; 9/19/2014: Tr. p. 61

& Ex. D, p. 24; 9/22/2014: Tr. p. 61 & Ex. D, p. 24; 9/23/2014: Tr. p. 61 & Ex. D, p. 24;

10/14/2014: Tr. p. 61 & Ex. D, p. 27; 10/15/2014: Tr. p. 61 & Ex. D, p. 27; 12/9/2014: Tr. p. 61

& Ex. D, p. 35; 12/17/2014: Tr. p. 61 & Ex. D, p. 36; 12/22/2014: Tr. p. 61 & Ex. D, p. 37;

12/23/2014: Tr. p. 61 & Ex. D, p. 37; 12/26/2014: Tr. p. 61 & Ex. D, p. 38; 1/5/2015: Tr. p. 61 &

Plaintiff's 2015 Time Cards, attached as Ex. E to Trotier Aff.  ("Ex. E"), p. 1; 1/6/2015: Tr. p. 61

& Ex. E, p. 1; 1/7/2015: Tr. p. 61 & Ex. E, p. 1; 1/8/2015: Tr. p. 61 & Ex. E, p. 1; 1/12/2015: Tr.

p. 61 & Ex. E, p. 2; 1/13/2015: Tr. p. 61 & Ex. E, p. 2; 1/14/2015: Tr. p. 61 & Ex. E, p. 2;

1/15/2015: Tr. p. 61 & Ex. E, p. 2; 2/2/2015: Tr. pp. 104-5 & Ex. E, p. 3; 2/3/2015: Tr. pp. 104-5

& Ex. E, p. 3; 2/4/2015: Tr. pp. 104-5 & Ex. E, p. 3; 2/5/2015: Tr. pp. 104-5 & Ex. E, p. 3;

2/6/2015: Tr. pp. 104-5 & Ex. E, p. 3; 2/9/2015: Tr. pp. 61, 105 & Ex. E, p. 4; 2/10/2015: Tr. pp.

61, 105 & Ex. E, p. 4; 2/11/2015: Tr. pp. 61, 105 & Ex. E, p. 4; 2/12/2015: Tr. pp. 61, 105 & Ex.

E, p. 4; 2/13/2015: Tr. pp. 61, 105 & Ex. E, p. 4; 2/16/2015: Tr. pp. 61, 105 & Ex. E, p. 5;

2/17/2015: Tr. pp. 61, 105 & Ex. E, p. 5; 2/18/2015: Tr. pp. 61, 105 & Ex. E, p. 5; 2/19/2015: Tr.

pp. 61, 105 & Ex. E, p. 5; 3/23/2015: Tr. p. 106 & Ex. E, p. 6; 3/24/2015: Tr. p. 106 & Ex. E, p.

6; 3/25/2015: Tr. p. 106 & Ex. E, p. 6; 3/31/2015: Tr. p. 61 & Ex. E, p. 7; 5/5/2015: Tr. p. 61 &

Ex. E, p. 10; 5/6/2015: Tr. p. 61 & Ex. E, p. 10.)

When working at client farms, Plaintiff has no clear recollection as to whether he was working as a mechanic or a driver. *DPF ¶ 36; see generally Ex. A at pp. 50-111.* When asked whether he was working as a mechanic or a driver while at a client farm, Plaintiff repeatedly answered "Do not recall" or "Couldn't tell you." *DPF ¶ 37; Ex. A at 50-52, 56-60, 62-71, 75, 77-103, & 106-111.* Plaintiff was assigned to work at client locations for 66% of the time. *DPF ¶ 38; Exs. D & E; Plaintiff's 2013 Time Cards attached as Ex. F. to Trotier Aff. ("Ex. F").*

### III.  PLAINTIFF REFUSED TO GET HIS CDL.

In late April or early May 2015, DR's co-owner, Dan Risch, told Plaintiff that he was required to get his CDL to continue working for DR. *DPF ¶ 39; Ex. A, p. 116.* All DR employees with driving duties were given the same requirement at this time – if you want to continue driving for DR, you must have your CDL. *DPF ¶ 40; Ex. B, RTA No. 4.* Plaintiff realized that he would not be permitted to drive for DR without his CDL. *DPF ¶ 41; Ex. B, RTA No. 13.* However, both Dan Risch and his co-owner/wife Jennifer Risch told Plaintiff that he would be returned to the schedule as soon as he received his CDL. *DPF ¶ 42; Ex. A at pp. 123, 133 & 171.* Plaintiff understood that he would continue to receive driver work with DR once he got his CDL. *DPF ¶ 43; Ex. B, RTA No. 57.*

Before getting a CDL, drivers must receive their federal Medical Examination Report or "Fed Med" card. *DPF ¶ 44; Ex. A 125; Risch Aff. ¶ 10.* Both Dan and Jennifer Risch were in frequent contact with Plaintiff encouraging him to get his Fed Med card. *DPF ¶ 45; Ex. A, p. 171.* In fact, Jennifer Risch contacted Plaintiff multiple times giving him locations where he could get his Fed Med card, offering to schedule his Fed Med card examination, offering to make his Fed Med appointment, and offering to pay for his Fed Med examination. *DPF ¶ 46-48; Ex. A, p. 130-131 & 171; Ex. B, RTA Nos. 5-8 & 56.*

Plaintiff delayed getting his Fed Med card for several weeks, claiming that he only could receive it from a Veterans Administration hospital. *DPF ¶ 49; Ex. A, p. 125.* Plaintiff further insisted that he needed to be evaluated by his VA-assigned psychiatrist, Christina Hove, before getting his Fed Med card. *DPF ¶ 50; Ex. A pp. 125-26.* Even though he was instructed in late April/early May 2015 that he needed his CDL, Plaintiff did not contact his VA-assigned physician until May 27, 2015 to inquire about getting his Fed Med card. *DPF ¶ 51; Ex. A, p. 132.* Strangely, Plaintiff underwent the Fed Med examination **and received his Fed Med card** on May <u>26</u>, 2015, one day before talking to Dr. Hove. *DPF ¶ 52; Plaintiff's Federal Medical Examination Report attached as Ex. G to Trotier Aff. ("Ex. G").*

Although Plaintiff received his Fed Med card, he never sought his CDL. *DPF ¶ 53; Pl.'s Resps. to Def.'s First Set of Interrogatories, attached as Ex. H to Trotier Aff., ("Interrog."), No. 7.* DR repeatedly contacted Plaintiff asking whether he received his CDL. *DPF ¶ 54; Ex. A, p. 171.* DR even offered to pay for his CDL. *DPF ¶ 55; Ex. A, p. 131.* Regardless, Plaintiff never made an appointment for a CDL test. *DPF ¶ 56; Ex. A, p. 133.*

As of the date of his deposition, Plaintiff still has never held a CDL. *DPF ¶ 57; Ex. B, RTA No. 17; Ex. A, p. 115.* Plaintiff stated that he never further pursued his CDL because he did not want to work as a driver, stating, "I'm a mechanic, not a CDL driver." *DPF ¶ 58; Ex. A pp. 134, 178 & 179.* He only wanted to work as a mechanic. *DPF ¶ 59; Ex. A pp. 134, 178 & 179.*

## IV.   PLAINTIFF VOLUNTARILY QUIT TO RUN HIS OWN DIESEL MECHANIC BUSINESS.

On February 25, 2015, Plaintiff formed Black Dawg Diesel, LLC, a diesel repair business. *DPF ¶ 60; Ex. A, p. 18.* Around that time, Plaintiff removed most of his tools from the DR shop. *DPF ¶ 61; Ex. A, p. 174.*

8

On June 18, 2015, Plaintiff removed his remaining tools from DR's workshop. *DPF ¶ 62; Ex. A, p. 173.* Plaintiff never told anyone that he was going to remove his tools and never formally resigned from his employment – he simply picked up his tools with no other explanation. *DPF ¶ 63; Ex. A, p. 173.* Plaintiff understood that he could have continued to work for DR at that point, if only he got his CDL. *DPF ¶ 64; Ex. A, p. 179.* Instead, he refused to get his CDL because he did not want to work as a driver. *DPF ¶ 65; Ex. A, p. 179.*

Plaintiff never was fired by DR. 66; *DPF ¶ Ex. A, p. 170.* Dan Risch never fired Plaintiff. *DPF ¶ 67; Ex. A, p. 170.* Jennifer Risch never fired Plaintiff. *DPF ¶ 68; Ex. A, p. 170.* Plaintiff never asked whether he was fired. *DPF ¶ 69; Ex. A, p. 180.* Before removing his tools, Plaintiff never attempted to return to work. Plaintiff never asked to be placed back on the driver schedule. *DPF ¶ 70; Ex. B, RTA Nos. 37-43.* Plaintiff never even asked DR to be scheduled as a mechanic. *DPF ¶ 71; Ex. B, RTA No. 45.* Plaintiff never asked DR for <u>any</u> non-driving assignments. *DPF ¶ 72; Ex. B, RTA No. 44.* He simply picked up his tools and never looked back. *DPF ¶ 73; Ex. A, p. 173.*

## V.   DR PROVIDED THE REQUESTED REASONABLE ACCOMMODATION.

Plaintiff contends that he was diagnosed with PTSD. *DPF ¶ 74; Dkt. 1, ¶ 6.* Plaintiff never provided medical certification of this PTSD diagnosis. *DPF ¶ 75; Ex. A, p. 134; Ex. B, RTA No. 36.* Plaintiff never was disciplined for anything related to his PTSD diagnosis. *DPF ¶ 76; Ex. A, p. 138.*

On April 16, 2015, Plaintiff made his only reasonable accommodation request: that he be permitted to be accompanied by a service dog when necessary. *DPF ¶ 77; Ex. A, p. 146.* Dan Risch immediately agreed to grant this accommodation. *DPF ¶ 78; Ex. A pp. 143 & 146; Ex. B, RTA Nos. 46-49.*

9

At some point prior to May 11, 2015, DR requested that Plaintiff provide medical documentation of his need for a service dog. *DPF ¶ 79; Ex. C., p. 4.* Plaintiff did not request the medical certification from his physician until May 19, 2015. *DPF ¶ 80; Ex. A, p. 163.* Plaintiff did not provide the medical certification to DR until May 22, 2015. *DPF ¶ 81; Ex. A, p. 163; Ex. C, pp. 4-5.* When provided, the medical certification stated that it was recommended that Plaintiff obtain a service dog, and that he be allowed to have that service dog accompany him in vocational environments. *DPF ¶ 82; May 19, 2015 Correspondence from Dr. Christina Hove, attached as Ex I to Trotier Aff. ("Ex. 1").*

On May 13, 2015, Plaintiff turned down driver work from DR for May 15 and 16, 2018, stating that he had to attend training for his service dog. *DPF ¶ 83; Dkt. 1, ¶ 24.* As a temporary measure to provide work for its non-CDL drivers who were in the process of getting their CDLs, DR had arranged for CDL-licensed drivers to transport the 6x6 trucks to client farms, where the drivers without CDLs could drive the vehicles legally within the farm boundaries. *DPF ¶ 84; Risch Aff. ¶ 11.* Plaintiff never provided notice to DR that his dog was undergoing training on this date. *DPF ¶ 85; Ex. A, p. 150.* Plaintiff also never provided medical certification that he needed to miss work to attend dog training. *DPF ¶ 86; Ex. A, p. 165.* Moreover, Plaintiff had not provided medical certification of the need for a service dog at this point. *DPF ¶ 87; Ex. A, p. 163; Ex. C, pp. 4-5.* Unfortunately, this temporary solution of using CDL drivers to transport vehicles to the non-CDL drivers was not practical, and DR discontinued this practice after trying it for a few days, so this option was no longer available to non-CDL drivers after the two dates offered to Plaintiff. *DPF ¶ 88-89; Risch Aff. ¶ 11.* Instead, the remaining drivers—other than Plaintiff—took the CDL test and received their CDLs. *DPF ¶ 90; Risch Aff. ¶ 11.*

Even though Plaintiff requested the service dog accommodation and was given permission by Mr. Risch to be accompanied by a service dog on April 16, 2015, Plaintiff did not begin service dog training until May 15, 2015. *DPF ¶ 91; Ex. A, p. 147.* Although training began on May 15, 2015, Plaintiff did not receive any certification for his service dog until November 1, 2015. *DPF ¶ 92; Ex. B, RTA Nos. 22-26.* The training that Plaintiff's dog received solely was designed to satisfy the American Kennel Club's "Good Canine Citizen Program Training", including sitting politely, walking, sitting and staying on command, and coming when called. *DPF ¶ 93; AKC's Canine Good Citizen Program CGC Test/Registration Form attached as Ex. J to Trotier Aff. ("Ex. J"); Ex. A, p. 151.* Plaintiff's service dog received no training related to accompanying him to work. *DPF ¶ 94; Ex. A, p. 170.* Plaintiff's service dog does not have the American Kennel Club Therapy Dog Training Certification. *DPF ¶ 95; Ex. A, p. 157.* Rather, Plaintiff's dog solely received obedience training, which was completed five months after he quit his job at DR. *DPF ¶ 96; Ex. A, p. 151; Ex. B, RTA Nos. 22-26.*

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Pursuant to Rule 56(c), summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322. Summary judgment must be granted unless the non-moving party comes forward with facts supported by evidence that would enable a reasonable jury to find in its favor. *Id.* at 322-23. A genuine issue of material fact is raised only if the evidence is such that a reasonable jury could

11

return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Here, no reasonable jury could return a verdict in favor of Plaintiff.

**ARGUMENT**

Based on the undisputed material facts, DR has not failed to reasonably accommodate Plaintiff and has not terminated Plaintiff in violation of the ADA. First, Plaintiff cannot state a *prima facie* case for discrimination under the ADA because he voluntarily resigned from his position. Second, Plaintiff was temporarily removed from the DR driver schedule for a legitimate, non-discriminatory reason: he did not have the required CDL, but he was told that he would be returned to the schedule, like the other driving employees lacking CDLs, once he obtained his CDL. Third, DR immediately agreed to provide the requested service dog accommodation once Plaintiff provided medical documentation of the need for this accommodation. Fourth, Plaintiff cannot state a *prima facie* case for discrimination because he was not qualified for the driver position—or any DR position with driving duties—without a CDL, which he refused to get. Accordingly, the Court should grant DR's motion and dismiss Plaintiff's complaint in its entirety with prejudice.

I. **PLAINTIFF CANNOT STATE A PRIMA FACIE CASE OF DISABILITY DISCRIMINATION BECAUSE HE VOLUNTARILY RESIGNED.**

Plaintiff's wrongful termination claim fails because he cannot establish a *prima facie* case of disability discrimination under the ADA. A plaintiff must fulfill the requirements of a *prima facie* case of discrimination by showing that: (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation; (3) he suffered from an adverse employment decision; and (4) it was more likely than not that the disability was the reason for the adverse employment action. *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 931 (7th Cir. 2001).

Plaintiff has not experienced an adverse job action because he voluntarily resigned. The courts repeatedly have held that voluntary resignation is not an adverse job action. *See, e.g., Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (indicating that an employee who resigns does not suffer an adverse employment action); *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 717 (8th Cir. 2003) (noting that "a plaintiff cannot state an adverse employment action if he voluntarily resigned" unless circumstances rise to the level of a constructive discharge); *Mayenschein v. WS Packaging Grp. Inc.*, No. 15-C-858, 2016 WL 6989785, at *6 (E.D. Wis. Nov. 29, 2016) (barring Age Discrimination in Employment Act and retaliation claim due to voluntary resignation)[1].

Plaintiff made the conscious decision not to get his CDL because he did not want to work for DR as a driver. Plaintiff simply refused to take the CDL examination, despite getting his Fed Med card, because, in his words, "I'm a mechanic, not a CDL driver." *DPF ¶ 97; Ex. A, p. 179*. Plaintiff voluntarily resigned from his position when he went to the DR shop on June 18, 2015 and removed his tools. Plaintiff then started his own business and has not attempted to return to work at DR, never asking for non-driver work or mechanic-only work. *DPF ¶ 98-100; Ex. B, RTA Nos. 37-45*. Plaintiff admits that he could have continued to work as a driver if he only got his CDL. *DPF ¶ 101; Ex. A, p. 179*. However, he refused to do so. Plaintiff cannot claim has he suffered an adverse action when it was his refusal to get a CDL that kept him off the schedule.

Plaintiff has not alleged that his voluntary resignation was a constructive discharge. Moreover, Plaintiff has not alleged in his complaint that he suffered from any type of harassment or discrimination that rises to the level of constructive discharge. To prove constructive discharge, Plaintiff must have not only shown that his working conditions were so intolerable that a reasonable person confronted with such circumstances would be compelled to resign, but

---

[1] Attached as Exhibit K to Trotier Aff.

also that the "conditions are beyond 'ordinary' discrimination". *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 440-41 (7th Cir. 2000) (internal citations omitted). In such a case, "a complaining employee is expected to remain on the job while seeking redress." *Id.* at 441. Plaintiff has not asserted any allegations in his complaint or offered any evidence indicating that his resignation was anything but voluntary. Plaintiff has not included any allegations of harassment in his complaint. Plaintiff has not included any harassment-related cause of action in his complaint. Thus, Plaintiff cannot frame his voluntary termination as a constructive discharge.

Plaintiff has argued that he was fired because a co-worker told him that if Dan Risch did not call you for work, "that means you're fired." *Ex. A, p. 170.* However, Plaintiff admits that Dan Risch never fired him. *DPF ¶ 102; Ex. A, p. 170.* Jennifer Risch never fired him. *DPF ¶ 103; Ex. A, p. 170.* The co-worker who provided this advice, Robin Lenz, was not a decision maker and did not have the authority to hire or fire. *DPF ¶ 104-105; Ex. A, p. 170.* Moreover, both Dan Risch and Jennifer Risch <u>repeatedly</u> <u>called</u> Plaintiff asking if he had his Fed Med card, and if he had his CDL so he could be put back on the schedule. *DPF ¶ 106-107; Ex. A, p. 171.* DR offered to pay for his Fed Med to get him back on the schedule. *DPF ¶ 108; Ex. A, p. 130.* DR offered to schedule the Fed Med exam for Plaintiff to get him back on the schedule quicker. 109; *DPF ¶ Ex. A, p. 131.* DR also offered to pay for his CDL. 110; *Ex. A, p. 131.*

Plaintiff has plainly stated that he does not want to work for DR as a driver. *DPF ¶ 111; Ex. A, p. 179.* Instead, he refused to take the CDL test and removed his mechanic's tools from the DR shop and focus on running his diesel repair business, which he set up several months before quitting. Because Plaintiff voluntarily quit, and because he has not alleged any facts in his complaint that his voluntary quit should be interpreted as a constructive discharge, Plaintiff

14

has not experienced an adverse action. Accordingly, Plaintiff cannot state a *prima facie* case for discrimination under the ADA, and the Court should dismiss Plaintiff's complaint in its entirety with prejudice.

## II. PLAINTIFF WAS REMOVED FROM THE SCHEDULE FOR A LEGITIMATE, NON-DISCRIMINATORY REASON: HE LACKED THE REQUIRED CDL.

Plaintiff was removed from the schedule – like all the other drivers – because he lacked the CDL necessary to drive DR's trucks on public roadways. This removal was non-discriminatory and done in order to comply with state law.

Similar to cases alleging discrimination under Title VII of the Civil Rights Act, the Seventh Circuit applies the *McDonnell Douglas* burden-shifting methodology to disability discrimination claims under the ADA. *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995). Under this method, an employer may overcome any prima facie case of discrimination by articulating a legitimate, non-discriminatory reason for its action. *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1032 (7th Cir. 1998). The burden of producing a legitimate, non-discriminatory reason sufficient to defeat a claim of discrimination is not an onerous one:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons . . . the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 & 257 (1981).

Numerous courts have held that the lack of a required CDL or other proper licensure was a legitimate, non-discriminatory reason for an adverse employment decision. *See, e.g., Lay v. Louisville-Jefferson Cty. Metro Gov't*, No. 3:17-CV-00100-JHM, 2018 WL 2422333, at *6 (W.D. Ky. May 29, 2018) (stating that failure to obtain CDL within three months was a legitimate, non-discriminatory reason for termination, although ultimately denying summary

judgment)[2]; *June v. City of Gastoni*, No. 3:13-CV-612-RJC-DSC, 2015 WL 4249877, at *5 (W.D. N.C. July 13, 2015) (granting summary judgment based on employer's legitimate, non-discriminatory reason for promoting another employee over plaintiff because other employee had a CDL and more supervisory experience)[3]; *Toland v. AT&T*, No. 1:09-CV-2748-RLV-WEJ, 2011 WL 13177025, at *19 (N.D. Ga. April 20, 2011) (finding that plaintiff's loss of his CDL constituted a legitimate, non-discriminatory reason for termination)[4]; *Hilton v. Ohio Bell Tel. Co.*, No. 5:07CV1704, 2008 WL 11377738, at *8 (N.D. Ohio May 16, 2008) (defendant stated a legitimate, non-discriminatory reason for termination because employee drove company truck with suspended driver's license)[5]; *Randall v. Port of Portland*, 21 F. Supp. 2d 1225, 1228 (D. Or. 1998) (defendant stated a legitimate, non-discriminatory reason for termination after plaintiff failed to maintain a valid driver's license as required by Port policy).

Effective April 2014, DR required all employees with driving duties to hold a valid CDL so they could legally drive DR's 6x6 trucks on public roadways. *See* Wis. Stat. § 343.05(4)(a)2; *see also* Wis. Stat. § 340.01(24)(b)2 & 49 C.F.R. § 390.5. DR became aware of this new requirement in April 2015 after a DR driver was ticketed for driving without a valid CDL. *DPF ¶ 112; Risch Aff. ¶ 5.* DR immediately took all its non-CDL drivers – including Plaintiff – off the schedule and instructed all of them to get their CDLs immediately. *DPF ¶ 113; Ex. B, RTA No. 4.* Plaintiff understood that he would be back on the schedule once he obtained his CDL. *DPF ¶ 114; Ex. A, p. 199.*

Plaintiff refused to get his CDL. First, Plaintiff delayed in getting his Fed Med card. Once Plaintiff got his Fed Med card, he never got his CDL, despite being cleared to do so.

---

[2] Attached as Exhibit L to Trotier Aff.
[3] Attached as Exhibit M to Trotier Aff.
[4] Attached as Exhibit N to Trotier Aff.
[5] Attached as Exhibit O to Trotier Aff.

Plaintiff was told that he would be placed back on the schedule when he received his CDL. Plaintiff refused to do so and, thus, was not placed back on the schedule. As of the date of his deposition, Plaintiff still did not have his CDL.

Plaintiff has not alleged that his PTSD diagnosis interfered with his ability to get his CDL. *DPF ¶ 115; See generally Dkt. 1.* Rather, Plaintiff was cleared to test for his CDL when he got his Fed Med card. *DPF ¶ 116; Ex. A, p. 127.* Instead, Plaintiff refused to do so because he simply did not want to drive for DR. *DPF ¶ 117; Ex. A, p. 179.*

It is a defense to an ADA wrongful termination claim if an employer has a legitimate, non-discriminatory reason for any adverse action. In this case, DR removed Plaintiff – and all other non-CDL holding drivers – from the schedule until he received his CDL. Plaintiff knew he would be returned to the schedule as soon as he obtained his CDL. Although he had his Fed Med card allowing him to take the CDL test, Plaintiff never got his CDL. Accordingly, DR has stated a legitimate, non-discriminatory reason for removing Plaintiff from the schedule, and the Court should dismiss Plaintiff's complaint in its entirety with prejudice.

## III. DR AGREED TO PROVIDE PLAINTIFF WITH HIS REQUESTED ACCOMMODATION.

Under the ADA, employers have an obligation to provide reasonable accommodation to allow qualified applicants or employees to perform the essential functions of their positions. *See* 42 U.S.C. § 12112(b)(5)(A); *see also* 42 U.S.C. § 12111(9). The accommodation must be reasonable, both in the sense that it works and in terms of proportionality to the cost. *Van Zande v. State of Wis. Dep't of Adm.*, 44 F.3d 538, 543 (7th Cir. 1995).

The Seventh Circuit has stated, "An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodation – a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later

for failure to accommodate." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996).

Once an employee informs his or her employer of the need for an accommodation, the employer has a duty to enter into an interactive process, meaning an employer must have some form of two-way communication with the employee to determine a reasonable accommodation. *See, e.g., EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005). This communication requirement can be satisfied by meeting with the employee or by sending the employee a letter soliciting accommodation suggestions or documentation from the employee's physician. *Id.* at 806. Even though the employer should consult with the employee, the employer is not required to provide the specific accommodation requested by the employee. *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996).

An employer is allowed, however, to make medical inquiries of employees as long as such inquiries are job-related and consistent with business necessity, including requiring medical examinations. 42 U.S.C. § 12112(d)(4)(B); 29 C.F.R. § 1630.14(c); 29 C.F.R. Pt. 1630, App. § 1630.14(c); *Riechmann v. Cutler-Hammer, Inc.*, 183 F. Supp. 2d 1292, 1295 (D. Kan. 2001). *See also Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000) ("the ADA 'permits employers . . . to make inquiries or require medical examinations necessary to the reasonable accommodation process'" (quoting 29 C.F.R. § 1630.14(c))). *See also EEOC Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations* at 6, 8 FEPM (BNA) 405:7191, 7199 (1995); *EEOC Enforcement Guidance: The Americans with Disabilities Act and Psychiatric Disabilities* at 22-23, 8 FEPM (BNA) 405:7461, 7472-73 (1997).

18

On April 16, 2015, Plaintiff told Dan Risch that his doctor suggested he be accompanied by a service dog. *DPF ¶ 118; Ex. A, p. 146.* Dan Risch **immediately** agreed to do so. *DPF ¶ 119; Ex. A, pp. 143 & 146; Ex. B, RTA Nos. 46-49.* Jennifer Risch followed up with a request for a note from Plaintiff's physician. *DPF ¶ 120; Ex. C., p. 4.*

Plaintiff finally provided medical certification of the need for a service dog on May 22, 2015. *DPF ¶ 121; Ex. A, p. 163; Ex. C, pp. 4-5; Ex. I.* Curiously, Plaintiff did not have a certified service dog at that time; rather, Plaintiff's dog did not receive any type of certification whatsoever until five months after he quit. *DPF ¶ 122-123; Ex. B, RTA Nos. 22-26.* This certification was for the AKC Good Canine Citizen Program. *DPF ¶ 124; Ex. J; Ex. A, p. 151.*

Regardless, it does not matter when Plaintiff provided medical certification of the need for accommodation. It does not matter that Plaintiff had not yet provided certification of the need for a service dog when he turned down work from DR. It does not matter that Plaintiff did not have a trained dog until 5 months after he quit. It does not matter that Plaintiff's dog did not have any training beyond basic obedience. What matters is that <u>DR met its obligations with respect to reasonable accommodation and the interactive process</u>. Plaintiff requested a reasonable accommodation: to be accompanied by a service dog. **DR immediately agreed to allow this.** DR requested medical certification. Plaintiff eventually provided that medical certification. At all times, Plaintiff understood that his reasonable accommodation had been granted. *DPF ¶ 125; Ex. A pp. 143 & 146; Ex. B, RTA Nos. 46-49.*

It is undisputed that DR agreed to provide the requested reasonable accommodation. It should be noted, however, that any such accommodation only would be necessary if Plaintiff was "otherwise qualified" for the position. *See* 29 C.F.R. § 1630.2(m). As stated in the ADA regulations:

> The term "otherwise qualified" is intended to make clear that the obligation to make reasonable accommodation is owed only to an individual with a disability who is qualified within the meaning of § 1630.2(m) in that he or she satisfies all the skill, experience, education or other job-related selection criteria. An individual with a disability is "otherwise qualified," in other words, if he or she is qualified for a job, except that, because of the disability, he or she needs a reasonable accommodation to be able to perform the job's essential functions.

29 C.F.R. § Pt. 1630 App. Plaintiff was not "otherwise qualified" because he did not have his CDL. Thus, Plaintiff had no right to a reasonable accommodation and cannot actually state a claim for such without his CDL. Regardless of his failure to be "otherwise qualified", DR provided the requested accommodation. Accordingly, the Court should dismiss Plaintiff's complaint in its entirety with prejudice.

## IV. PLAINTIFF WAS NOT QUALIFIED FOR THE POSITION WITHOUT A CDL, WHICH HE REFUSED TO GET.

As discussed in Section I, above, Plaintiff cannot state a disability discrimination claim under the ADA if he cannot establish a *prima facie* case. To do so, Plaintiff must state that he is "qualified to perform the essential functions of his job, either with or without reasonable accommodation." *Lawson*, 245 F.3d at 922.

Simply put, Plaintiff was not qualified for the position. Plaintiff spent substantial time driving in his position for DR and, as of April 2015, Plaintiff and all DR employees with driving duties were required to hold a CDL. *DPF ¶ 126-127; Ex. A, p. 53; Ex. B, RTA No. 4.* As discussed in Section II above, many courts have held that possessing a CDL or other valid driver's license will be a necessary qualification for a position like the driver position at DR. *See Toland*, 2011 WL 13177025, at *19 (finding that plaintiff has failed to establish a *prima facie* case of disability discrimination because his loss of his CDL left him unqualified to perform the essential functions of his job).

When Plaintiff was hired in 2013, he was qualified to drive for DR because a CDL was not required at that time. Wisconsin law subsequently changed, requiring all DR drivers to hold a valid CDL. Without the CDL, Plaintiff no longer was qualified to perform the essential functions of his position. Accordingly, Plaintiff cannot state a *prima facie* case of disability discrimination under the ADA, and the Court should dismiss this complaint in its entirety with prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, DR respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's complaint in its entirety with prejudice.

Dated this 28th day of September, 2018.

s/ Geoffrey S. Trotier
Geoffrey S. Trotier (SBN 1047083)
Devin S. Hayes (SBN 1089943)
Attorneys for Defendant, DR Ag Services, Inc.
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
Telephone: (414) 287-1369
Fax: (414) 238-6623
Email: gtrotier@vonbriesen.com
          dhayes@vonbriesen.com

31852899_1.DOCX